**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **4:12CR00224 BSM** |
| | ) | |
| | ) | |
| **RICHARD DUANE JOHNS, M.D.** | ) | |

### GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS

The United States of America, by and through counsel, Christopher R. Thyer, United States Attorney, and Anne E. Gardner, Assistant United States Attorney, for its Response submits the following:

### ISSUE

The defendant challenges the issuance of the December 1, 2014 search warrant for Prescription Monitoring Program (PMP) data obtained by the Lonoke County Sheriff's Office pursuant to Arkansas Code Annotated Section 20-7-606 (2011). The defendant challenges the PMP search warrant as 1) lacking probable cause, 2) being overbroad, and 3) because the PMP is being applied unconstitutionally. The defendant challenges three additional PMP search warrants as being overbroad.

### BACKGROUND

On November 8, 2014, the Lonoke County Sheriff's Office was called to investigate the death of Curtis Norris at 1605 Pickthorne Road, Cabot, Arkansas. The residence was occupied by David Scroggins, his wife Donna Scroggins, their daughter Marissa Scroggins, and the

deceased Curtis Norris.  Marissa Scroggins provided a verbal and written statement to Lonoke

Det. Clint Eifling and Sgt. Brandon Hampton that Norris had injuries to his neck and had

obtained a prescription for oxycodone from Dr. Richard Johns.  Over a period of two hours that

evening, Norris crushed and "shot up" approximately 6, 30 mg tablets of oxycodone from a

prescription written by Dr. Johns.  Marissa Scroggins confirmed that two cellular phones located

in the bedroom where Norris died were being used by she and Norris.  When Lonoke County

Detectives arrived at the scene, the bedroom in which Norris' body was located had been cleaned

of any drug paraphernalia and the trash had been removed.  Detectives asked David Scroggins

for permission to search the remaining rooms of the residence, which he denied.

On the same date, Det. Eifling and Sgt. Hampton went to the home of Eric Jones, Norris'

older brother, where Norris' mother was also residing in order to inform the family of Norris'

death.  Upon learning of his brother's death, Jones volunteered information to Det. Eifling and

Sgt. Hampton.  Jones stated that Norris did not have any neck or back injuries, and that Norris

was being asked by David Scroggins to fraudulently obtain oxycodone prescriptions from Dr.

Johns.  Norris had given Jones one of the prescription bottles obtained by Norris from Dr. Johns.

Jones knew Norris to be "hooked" on oxycodone, and that David Scroggins was using Norris to

further his illegal activity.  Jones knew Norris to be paid $400 per prescription he obtained by

David Scroggins.  Det. Eifling was raised in Lonoke County and knew Jones from the

community.  Det. Eifling was aware that Jones and Norris were brothers and that they had a very

close relationship.  Jones disclosed to Det. Eifling that Norris had told him details about his

addiction and his participation with David Scroggins in fraudulently obtaining prescriptions for

oxycodone.  Det. Eifling had confiscated two cellular phones from Norris' death scene.  Norris'

mother confirmed that she owned the phones, but that Norris and Marissa Scroggins were using

the phones.  Norris' mother gave permission to search the cellular phones.

Notwithstanding permission to search the cellular phones, Det. Eifling obtained a search warrant for the phones on November 18, 2014.  Pursuant to the search warrant, Det. Eifling accessed the phones where he observed messages on Norris' and Marissa Scroggins' open Facebook pages, as well as text messages on the phones.  Det. Eifling noted several messages from the phones, including messages to and from Bryan Scroggins, that had coded "drug talk," as well as messages from Marissa Scroggins' Facebook page to and from Nick Tyner, stating that her father had a doctor from whom Tyner could fraudulently obtain oxycodone pills.

On December 1, 2014, Det. Eifling sought and received a search warrant to obtain PMP records for David Scroggins, Marissa Scroggins, Donna Scroggins, Bryan Scroggins, Eric Jones, the deceased Curtis Norris, and Nick Tyner, as well as prescribing records of Dr. Richard Johns going back to January 1, 2014.  At the time of the December 1, 2014 PMP search warrant, six of the seven individuals were targets of an investigation involving obtaining prescriptions by fraud. The seventh, Eric Jones' PMP data, was requested because Jones expressed concern that Norris may have been using his identity to obtain false oxycodone prescriptions.

After receiving the requested PMP information, Det. Eifling identified a patient of Dr. Johns as being involved in a Lonoke County investigation into a stolen vehicle.  Det. Eifling contacted this individual regarding the stolen vehicle.  During the conversation, Det. Eifling asked the individual whether he/she knew Dr. Johns.  The individual stated that yes, Dr. Johns was his/her doctor and was a good Christian man.  The conversation went no further, and Det. Eifling provided no information about any investigation involving Dr. Johns.  Approximately 3 hours later, the individual reached out to Det. Eifling via Facebook and asked to meet with him. At a later, in person meeting, the individual disclosed to Det. Eifling that Dr. Johns was the

source for fraudulent prescriptions for many individuals in Lonoke County, including David Scroggins. The individual identified David Scroggins as someone who could meet with Dr. Johns in person to obtain fraudulent prescriptions. As part of the already established investigation into David Scroggins, Lonoke County detectives installed a GPS tracker on David Scroggins' vehicle. Through this tracking device, Lonoke officers were able to observe and photograph David Scroggins meeting with Dr. Johns and thereafter traveling to various pharmacies. On February 10, 2015, Lonoke detectives along with DEA Diversion Investigators approached David Scroggins to question him about his activities with Dr. Johns. When contacted, David Scroggins came voluntarily to the Lonoke Sheriff's Office to meet with officers. At that time, David Scroggins had a fraudulent prescription, as well as a "patient list" on his person. David Scroggins provided information regarding the fraudulent prescription ring involving Dr. Johns and agreed to work as a confidential informant for the Lonoke County Sheriff's Office in the investigation. At the time Lonoke detectives and DEA Diversion Investigators met with David Scroggins, David Scroggins was told only that there had been a tracker on his vehicle and that Jones had provided information regarding his activities with Norris. No information about the individual identified from the PMP search warrant was provided to David Scroggins at that time, and to date, has not been provided by officers to David Scroggins.

Det. Eifling's review of the PMP data for Dr. Johns from the December 1, 2014 search warrant revealed that numerous patients who were receiving oxycodone from Dr. Johns were known in Lonoke County to be involved in drug use and trafficking. Therefore, a second PMP search warrant dating to January 1, 2013 was requested and authorized to obtain additional prescribing records for Dr. Johns. As the investigation moved forward in 2015, two additional

PMP search warrants for Dr. Johns' most recent prescribing records were requested and authorized.

## ARGUMENT AND AUTHORITY

A.  Standing

Although there is no direct authority in the Eighth Circuit regarding a medical practitioner's standing to challenge a prescription data search warrant on his patients' behalves, the cases cited by the defendant find that both the patient and the practitioner have a substantive expectation of privacy in data collected in Prescription Monitoring Program databases similar to the Arkansas PMP database.  Therefore, the United States will concede standing to Dr. Johns to challenge the search warrants obtained for his prescription records.  The United States asserts that he does not have standing to challenge the search warrant for the seven other individuals' records requested in the search warrant of December 1, 2014[1].

B.  Probable Cause

Arkansas Prescription Drug Monitoring Program Act, Arkansas Code Annotated Section 20-7-606 (2011)[2], provides for disclosure of prescription information in various contexts.  As it pertains to this case, information held in the Arkansas PMP database could be accessed by:

> "A certified law enforcement officer pursuant to a criminal investigation but only after the law enforcement officer obtains a search warrant signed by a judge that demonstrates *probable cause to believe that a violation of federal or state criminal law has occurred*, that specified information contained in the database *would assist in the investigation of the crime*, and that the specified information should be released to the certified law enforcement officer;"

A.C.A. § 20-7-606(b)(2)(A) (emphasis added).

---

[1]  The defendant does not have standing to challenge the cellular phone warrants mentioned below.

[2]  ACA 20-7-606 was amended in July, 2015 to provide exceptions to the search warrant requirement for a "certified law enforcement prescription drug diversion investigator of a qualified law enforcement agency."

The Eighth Circuit defines probable cause as, "sufficient facts to lead a prudent person to believe that there is a 'fair probability that contraband or evidence of a crime will be found in a particular place. . . .'" *United States v. Grant*, 490 F.3d 627, 631 (8th Cir. 2007)(internal citation omitted)(quoting, *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317 (1983)).  "Whether probable cause to issue a search warrant has been established is determined by considering the totality of the circumstances, and resolution of the question by an issuing judge, 'should be paid great deference by reviewing courts.'"  *Grant*, 490 F.3d at 631 (quoting, *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317 (1983)).  The sufficiency of a search warrant affidavit is examined using a "common sense" and not a "hypertechnical" approach.  *Id*. (quoting, *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005)).  Where witnesses are identified and have personal and recent knowledge of events, their statements are sufficient to establish probable cause.  *See, United States v. Dukes*, 432 F.3d 910, 913 (8th Cir. 2006)(explaining, "[i]t is well-settled that the personal and recent knowledge of named eyewitnesses is sufficient to establish probable cause.")(citing *Cundiff v. United States*, 501 F.2d 188, 190 (8th Cir. 1974)(finding that the "personal and recent knowledge of identified eyewitnesses" to a holdup operation and getaway attempt sufficient to establish probable cause)); s*ee also, United States v. Grant*, 490 F.3d 627, 632 (8th Cir. 2007)(finding an officer's summary of witness statements in the affidavit sufficient to support probable cause); *United States v. Deffenbaugh*, No. 4:15CR00002 JLH, 2016 WL 1064510, at *2 (E.D. Ark. Mar. 17, 2016)(finding that defendant is "mistaken in arguing that statements by the victim of a crime, as opposed to statements by an informant, must be corroborated")(citing *United States v. McKinney*, 328 F.3d 993, 994 (8th Cir. 2003)(abrogated in part on other grounds)("[L]aw enforcement officers are entitled to rely on information supplied by the victim of a crime, absent some indication that the information is not reasonably

trustworthy or reliable." *Clay v. Conlee,* 815 F.2d 1164, 1168 (8th Cir. 1987)."); *United States v. Dan Thanh Nguyen*, Crim. No. 06-192 (PAM/SRN), 2006 WL 3486993, at *7 (D. Minn. Dec. 4, 2006)(citing authorities for the proposition that where the information in an affidavit for a warrant comes from a citizen or victim, rather than a police informant, that information is sufficient to supply probable cause without further corroboration).  Further, an informant's statement can be sufficiently reliable to support probable cause if the informant has previously provided reliable information or if the information is corroborated by independent evidence. *See*, *United States v. Williams*, 10 F.3d 590, 593 (8th Cir. 1993).  Information provided by one informant may be "corroborated with specific, consistent details provided by [a] second informant," and, information from two informants may be "reciprocally corroborative, rendering their information enough to support a finding of probable cause."  *United States v. Fulgham*, 143 F.3d 399, 401 (8th Cir. 1998); *see also, United States v. Leppert*, 408 F.3d 1039, 1042 (8th Cir. 2005)(finding that cross-corroboration of details in the informants' statements supported the reliability of the informant as a whole).  Finally, to the extent Arkansas Rule of Criminal Procedure 13.1(b)'s requirements regarding hearsay statements in an affidavit are more strict than those of the Federal laws or Constitution, it is well-settled that "states are not free to impose on Federal courts requirements more strict than those of the Federal laws or Constitution."  *United States v. Moore*, 956 F.2d 843, 847 (8th Cir. 1992)(quoting *United States v. Combs*, 672 F.2d 574, 578 (6th Cir. 1982)); *see,* U*nited States v. Maholy,* 1 F.3d 718, 721 (8th Cir.1993)(holding, that "the defendant's claim that a "nighttime search violated Arkansas Rule 13.2(c) is irrelevant to determining, at least in the first instance, whether the fruits of the search are admissible in federal court.").   Furthermore, the Court need not reach the issue of whether law enforcement violated Arkansas law.  *See, United States v. Bieri*, 21 F.3d 811, 816 (8th Cir.

1994).

The affidavit of December 1, 2014 was drafted by Lonoke County Sheriff's Detective Clint Eifling as part of an ongoing investigation into Curtis Norris', David Scroggins' and others' involvement in obtaining fraudulent prescriptions for oxycodone. The investigation into the fraudulent prescription ring was precipitated by the suspected oxycodone overdose death of Curtis Norris on November 8, 2014. In meeting the requirements of A.C.A. § 20-7-606(b)(2)(A), the affidavit must state probable cause to believe that a violation of federal or state criminal law has occurred. The affidavit states that the investigation involves a violation of A.C.A. § 5-64-403, Controlled Substances-Fraudulent Practices. Probable cause in support of this criminal violation included statements from Marissa Scroggins, an identified witness to Curtis Norris' death, statements of Eric Jones, an identified witness and Curtis Norris' older brother, and review of telephone messages from phones seized from Norris' death scene used by Curtis Norris and Marissa Scroggins. The defendant challenges probable cause asserting that the uncorroborated hearsay statement of Eric Jones constitutes the only probable cause in the warrant, and that the statement is unreliable. This argument fails for the following reasons.

In addition to Jones' statements made on the date of Norris' death, the affidavit contains statements of Marissa Scroggins made on the date of Norris' death. These statements are from witnesses with personal knowledge of events, rather than law enforcement informants, and were made close in time to Norris' death and at the beginning of the investigation. The defendant asserts that these statements contradict each other, but they do not, as the statements support probable cause to believe that Norris was obtaining fraudulent oxycodone prescriptions written by Dr. Johns. The affidavit reads,

"[o]n November 8, 2014, Curtis Norris passed away from a suspected overdose at 1605

Pickthorne Road, Cabot, Arkansas.  According to Norris' girlfriend Marissa Scroggins (xx/xx86), Norris "shot up" on two separate occasions the evening prior to his death.  She stated that he injected 6 tablets total of Oxycodone 30mgs altogether.  Scroggins stated that Norris had severe neck and back injuries and was prescribed the medication by Richard Johns MD."

"On November 8, 2014, in an interview with Eric Jones (xx/xx/.85) he stated that Norris had never had an injury to his back or neck.  Jones who is Norris' older brother stated that the injury Scroggins described are the injuries that he himself suffers from.  Jones also stated that Norris had filled fraudulent prescription at Cabot Pharmacy.  The prescriptions were written to Curtis Norris from Dr. Richard Johns.  Norris received 90 30mg Oxycodone pills."

"Eric Jones stated that the fraudulent prescription that was obtain by Norris was facilitated by David Scroggins (xx/xx/59).  Jones stated that D. Scroggins paid Norris $400 to go to Richard Johns and get the prescription and give them back to D. Scroggins to sell."

Marissa Scroggins stated she knew Norris "shot up" a total of 6, 30 mg oxycodone tablets the night he died.  She stated that he received the medication by prescription from Richard Johns, M.D., because he had severe neck and back injuries.  Eric Jones stated that his younger brother, Norris, had never had an injury to his back or neck, and that he had fraudulently obtained the prescription.  These statements support the fact that Norris was illicitly using oxycodone.  If Norris was taking, legitimately, a prescription for neck and back pain, he would not have "shot up" 6 oxycodone pills over the course of an evening. Further, Jones stated that Norris had previously filled fraudulent prescriptions at Cabot Pharmacy that had been written by Dr. Richard Johns.  Jones knew these prescriptions to be for 90, 30 mg oxycodone.  Jones' account of what Norris was getting prescriptions for and who wrote them was consistent with Marissa Scroggins' statement about what drug he had used the night of his death and who wrote that prescription.  Jones' statements came from an interview with Jones the day his brother died. Jones obviously had first-hand knowledge of his own neck and back ailments, and as a close

relative of Norris, reasonably would have known whether Norris had the neck and back injuries reported by Marissa Scroggins.

Jones' second statement was that Norris' receipt of fraudulent prescriptions was facilitated by David Scroggins, who paid Norris $400 to get prescriptions from Richard Johns and return them to David Scroggins to sell.  Jones accurately described the prescriptions being obtained by Norris, and he provided details about where Norris was filling prescriptions and how much David Scroggins was paying him.  Such details add to the reliability of his statements about how Norris came to be in possession of these prescriptions.  *See, United States v. Fulgham*, 143 F.3d 399, 401 (8th Cir. 1998); *United States v. Leppert*, 408 F.3d 1039, 1042 (8th Cir. 2005). Additionally, this statement was corroborated by the affiant's research into the telephones possessed by Norris and Marissa Scroggins the night of Norris' death.  A separate and previously executed search warrant allowed the affiant to view messages in these phones that provided information that the affiant said supported the idea that David Scroggins was enlisting individuals to use Dr. Richard Johns to get prescriptions that David Scroggins was selling on the illicit market.  The affiant stated that "I obtained evidence, through various messages," thus confirming that he had first-hand knowledge of what the messages said and summarizing their relevant content in the affidavit.  *See, id.*

In *United States v. Grant*, witness testimony obtained from third party witnesses without prior corroboration was held to be sufficient to establish probable cause for search of a computer for child pornography.  *See, Grant*, 490 F.3d 627 at 632.  In *Grant*, the information in the affidavit was twice removed from the affiant, as the affiant received the information from the employer of a computer technician who saw child pornography on a computer tendered for servicing to the employer's shop.  *Id*.  The affidavit in that case contained only the

10

representations of the computer store owner, without other corroborating evidence. *Id.*
Nonetheless, the court found that neutral, third party information from an experienced individual
who had first-hand knowledge of what he saw on the computer, as summarized by the affiant,
was sufficient to establish probable cause. *Id.*

In this case, the affidavit at issue has more supporting facts and corroboration than in
*Grant.* The crime being investigated for which probable cause was necessary was the acquiring
of controlled substances by misrepresentation, fraud, forgery, deception, subterfuge, or theft.
Probable cause can be found from the totality of the information in the affidavit. Although, the
statements of Eric Jones and Marissa Scroggins are arguably not from neutral, third party
witnesses, as Jones was Norris' brother and Marissa Scroggins was his girlfriend, these two
independently taken statements internally corroborate each other, and Jones' information is
further corroborated by the information independently reviewed by Det. Eifling from the cellular
phones. The totality of the affidavit provided probable cause to believe that Norris was illicitly
using 30 mg oxycodone, and that Norris and David Scroggins were engaging in fraud or
deception to obtain these prescriptions, either with or without the knowledge of Dr. Johns.

C. <u>Scope</u>

The defendant challenges the scope of the records requested from the PMP as overbroad.
The defendant asserts that to search the PMP database for prescription records of all of Dr. Johns
patients required probable cause that all of Dr. Johns patients were committing a crime.
However, such probable cause is not required to satisfy the search warrant requirement of A.C.A.
§ 20-7-606(b)(2)(A). If the affidavit includes probable cause to believe a crime is being
committed, then the affiant must show "that specified information contained in the database
*would assist in the investigation of the crime"*. Therefore, Det. Eifling was required to show that

the prescription records requested would assist in the ongoing investigation, not that there was probable cause to believe that each and every prescription record, itself, was evidence of a crime.

In asserting that the State was required to have probable cause for each of Dr. John's patient records, the defendant cites to Fourth Amendment protections for patients' medical records, and specifically cites to the case of *Oregon Prescription Drug Monitoring Program v. U.S. Drug Enforcement Administration*, 998 F.Supp.2d 957 (Dist. Ct. Oregon 2014).  *Oregon Prescription Drug Monitoring Program* differs from this case in that the issue was DEA's use of federal administrative subpoenas to obtain PDMP data.  In doing the analysis, the Oregon District Court found that the nature of PDMP records to be "more inherently personal and private than bank records," and that a "subjective expectation of privacy in [] prescription information is objectively reasonable." *Oregon Prescription Drug Monitoring Program*, 998 F.Supp.2d 957 at 966-67.  In coming to this conclusion, the court noted that, "[a]lthough there is not an absolute right to privacy in prescription information, as patients must expect that physicians, pharmacists, and other medical personnel can and must have access to their records, it is more than reasonable for patients to believe that law enforcement agencies will not have unfettered access to their records." *Id.* at 966.  In *Oregon Prescription Drug Monitoring Program*, however, the court was addressing the acquisition of records through administrative subpoena, not through a warrant issued on probable cause by a judge.  Although the language is instructive in showing that there is a privacy interest in medical data, it does not address the extent to which such privacy interests in data held in the prescription monitoring program database give way to a legitimate government interest under a probable cause search warrant issued by a judge.

*Oregon Prescription Drug Monitoring Program v. U.S. Drug Enforcement Administration*, has been distinguished by two recent cases; *Lewis v. Superior Court of Los*

*Angeles County*, 226 Cal.App.4th 933 (2014) and *United States v. Zadeh*, 2014 WL 11370114

(slip copy N.D. Texas, Dec. 3, 2014).  In *Lewis*, the petitioner challenged the constitutionality of

allowing the Medical Board of California to search the CARES database (prescription database)

without a showing of any kind, good cause, reasonable suspicion etc., to access prescription

records of patients for practitioners who were under investigation.  *See, Lewis*, 226 Cal.App.4th

at 941.  Although a different issue than posed by the defendant, the court's analysis of patients'

privacy interests asserted by their doctor, as well as the expectation of privacy in prescription

records is instructive.  In *Lewis*, the court recognized that prescription records carry a privacy

interest similar to that of medical records.  *Lewis*, 226 Cal.App.4th at 947.  The court also

recognized a legally protected privacy interest under the CARES statute, which prohibits

unauthorized disclosure of prescription data similar to the provisions of the Arkansas PMP

statute.  *Id*.  However, the court explained that prescription records are subject to regulatory

scrutiny, different from patient medical records, and as such CARES records carried a

diminished expectation of privacy.  *Id*. at 948 (explaining, "[a] reasonable patient filling a

prescription for a controlled substance knows or should know that the state, which prohibits the

distribution and use of such drugs without a prescription, will monitor the flow of these drugs

from pharmacies to patients. . . . this regulatory history significantly diminishes any reasonable

expectation of privacy against the release of controlled substances prescription records to state,

local or federal agencies for purposes of criminal, civil, or disciplinary investigations.").  Similar

to the Arkansas PMP which allows the Arkansas Department of Health to review the PMP data

for patient or practitioner misuse or abuse, the CARES statute provided access to the California

Department of Justice, thereby diminishing the privacy interest of patients in the database.  *Id*. at

953.  The court balanced the individual's privacy interest against the interests of the state.  *Id*. at

953.  The court found that the State had a compelling interest in controlling the diversion and abuse of controlled substances, and that the state had a compelling interest in exercising its regulatory power to protect the public against incompetent, impaired, or negligent physicians. *Id.* at 953.  In *United States v. Zedah*, the question was more akin to that in *Oregon Prescription Drug Monitoring Program*, as the DEA was seeking full medical records, not just prescription records, from a physician via an administrative subpoena.  The United States District Court for the Northern District of Texas found that the "government's stake in the investigation and the strong public interest in regulating controlled substances outweigh[ed] the individual privacy interests asserted [t]herein."  *United States v. Zedah*, 2014 WL 11370114 *10 (N.D. Texas).  The court explained, "[w]hile the cases discussed above mainly dealt with pharmacies and pharmacists, the Court concludes that such analysis can easily be applied to physicians, and in turn, their patients.  Both have a reduced expectation of privacy in the medical records regarding controlled substances as such records are relevant to the issue of whether there has been compliance with the CSA [Controlled Substances Act], a federal law that regulates controlled substances."  *Zedah*, 2014 WL 11370114 *10 (N.D.Texas).

Under A.C.A. § 20-7-606(b)(2)(A), if the affidavit includes probable cause to believe a crime is being committed, then the affiant must show "that specified information contained in the database *would assist in the investigation of the crime"*.  The way in which the statute is written contemplates that where a certified law enforcement officer has a legitimate investigation underway into the misuse or abuse of controlled substances, PMP records that include patient information can be obtained for use in furtherance of that investigation.  A.C.A. § 20-7-606(b)(2)(A) mirrors the balancing of individual privacy rights and the interest of the state in preventing the diversion of controlled substances that has been discussed in the cases above.  The

14

statutory language chosen indicates that the particularity requirement in the PMP Act is different from that for a residential or other location search warrant.

The PMP records were also requested with specificity.  The request was for "prescriptions that have been filled since January 1, 2014 for the following individuals associated with D. Scroggins," as well as, "all prescriptions written by Dr. Richard Johns since January 1, 2014."  The request identifies specific records in the Arkansas PMP database, rather than requesting access to the database as a whole.  These records "would assist in the investigation of the crime," as the 7 patients' records would show whether these individuals associated with David Scroggins were filling oxycodone prescriptions, and the prescription records of Dr. Richard Johns would show whether Dr. Johns was writing prescriptions for oxycodone and the frequency and pattern of prescribing of oxycodone.

The defendant asserts that the affiant did not state that Dr. Johns had committed a crime. At the time the affidavit was written, there was probable cause to believe that Norris was illegally obtaining oxycodone prescriptions, but the participation of Dr. Johns was undetermined. The request for Dr. Johns' prescription records was an integral part of the ongoing investigation into Norris', David Scroggins' and others' obtaining oxycodone by misrepresentation, fraud, forgery, deception, subterfuge, or theft.  The defendant suggests that the PMP request should have been limited to opioid prescriptions written by Dr. Johns.  However, a limited search for opioid prescriptions would not present an accurate picture of the pattern of practice for Dr. Johns by showing what part of his practice included opioid prescriptions.  *See, United States v. Lievertz*, 247 F.Supp.2d 1052, 1062 (S.D. Indiana 2002)(finding warrant was not overbroad, in that it would be impossible for the government to determine how many patients were involved in the alleged scheme to overprescribe and distribute controlled substances if the government were

unable to search all of the medical files).  At the time of the first search warrant request, Dr.

Johns' PMP records may just as easily have exculpated as inculpated him in the crime.   But

either way, the records would assist in the investigation of a crime, which is the appropriate test.

The defendant challenges the scope of the subsequent search warrants issued on January

12, 2015, February 9, 2015, and May 4, 2015.  These warrants authorized the receipt of PMP

records for all prescriptions written by Dr. Johns for different time periods.  The January 12,

2015 warrant requested the PMP data for Dr. Johns from January 1, 2013 to January 12, 2015.

The first warrant had already provided the data for January 1, 2014 to December 1, 2014, so the

second warrant request was for data from January 1, 2013 to January 1, 2014, and December 1,

2014 to January 12, 2015.  The third affidavit included additional probable cause that David

Scroggins was seen meeting with Dr. Johns and then visiting several pharmacies.  The

prescription data requested was relevant to show whether Dr. Johns wrote prescriptions to David

Scroggins on those dates and also to confirm whether Dr. Johns wrote prescriptions to other

suspects in the investigation.  The request was for the most current PMP data for Dr. Johns from

January 13, 2015 to February 9, 2015.  The fourth affidavit requested three months of PMP

records from February 1, 2015 to May 4, 2015 as part of the ongoing investigation.  Each request

was limited in duration and focused on the PMP records of Dr. Johns.  For the reasons discussed

above, the request for PMP records that would assist in the investigation of the enumerated crime

was not overly broad or lacking particularity.  The requests were done pursuant to valid warrants

as required by A.C.A. § 20-7-606(b)(2)(A).  The warrants neither violated the Arkansas statute

nor the Fourth Amendment.

Therefore, the scope of the warrant neither violated the defendant's nor any of his

patient's Fourth Amendment rights.  The PMP information sought was particular to the crime

being committed and would assist in the investigation of a crime.

    D. *Leon* Good Faith Exception

    The affidavit for PMP records provided probable cause to believe that Norris, D. Scroggins and others had committed the crime of fraudulently obtaining oxycodone prescriptions.  But even if the affidavit lacked probable cause, the good faith exception in *United States v. Leon* should apply.   "Under the *Leon* good-faith exception, disputed evidence will be admitted if it was objectively reasonable for the officer executing a search warrant to have relied in good faith on the judge's determination that there was probable cause to issue the warrant." *Grant,* 490 F.3d 627, 632 (citing, *United States v. Leon,* 468 U.S. 897, 922 (1984)).  "In assessing whether the officer relied in good faith on the validity of the warrant, [the court] consider[s] the totality of the circumstances, including any information known to the officer but not included in the affidavit."  *Grant,* 490 F.3d at 632 (citing, *United States v. Chambers*, 987 F.2d 1331, 1335 (8th Cir. 1993)).   The inquiry is confined "'to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the [issuing judge's] authorization'."  *Grant,* 490 F.3d at 632 (quoting, *United States v. Leon*, 468 U.S. 897, 922 n. 23 (1984)).  In *Leon,* the Supreme Court identified the following circumstances in which an officer's reliance would be objectively unreasonable: first, when the affidavit included a false statement made knowingly and intentionally, or with reckless disregard for the truth, thus misleading the magistrate; second, where the judge wholly abandoned his or her judicial role when issuing the warrant; third, when the affidavit was so lacking in indicia of probable cause to render official belief in its existence entirely unreasonable; and fourth, when the warrant is so facially deficient that the officer could not reasonably presume the warrant to be valid.  *See, Grant* at 632-33 (citing, *United States v. Leon*, 468 U.S. 897, 923 (1984) and *United*

*States v. Puckett*, 466 F.3d 626, 630 (8th Cir. 2006)).  To the extent that Arkansas Rule of

Criminal Procedure 13.1(b)'s language requiring statements in the affidavit verifying an

informant's reliability are more strict than Fourth Amendment requirements, whether the judge

failed to follow the State rule is irrelevant in determining whether the judge wholly abandoned

his judicial role, acting as a "rubber stamp."  *See, Maholy,* 1 F.3d at 721; *Moore*, 956 F.2d at

847.

The defendant asserts that the good faith exception should not apply, because Det. Eifling

was acting recklessly in including "scanty" hearsay in the affidavit, and the judge acted as a

"rubber stamp" because the hearsay statements were uncorroborated.  In support of this

argument, the defendant describes the statements of Jones and Marissa Scroggins as being in

conflict with each other and asserts that there was no evidence of Jones' reliability.  However,

the affidavit was not based solely on uncorroborated hearsay of Jones, as discussed above.

Jones' and Marissa Scroggins' contemporary and independent statements from identified

witnesses corroborated each other on the fact that Norris was illicitly using oxycodone that was

obtained by prescription from Dr. Johns.  Further corroboration of Jones' details about Norris

and David Scroggins fraudulently obtaining oxycodone came by way of the telephone messages

observed on Norris' and Marissa Scroggins' phones by the affiant.  Det. Eifling certainly did not

intentionally or recklessly provide false information to mislead the magistrate, and the affidavit

was not so lacking in "indicia of probable cause to render official belief in its existence entirely

unreasonable."   The internally corroborated statements by identified eye witnesses and the

telephone data were sufficient to establish probable cause, and there is no indication that the

judge wholly abandoned his judicial role, or that Det. Eifling could not have reasonably believed

the warrant to be valid.  This applies as well to the subsequent warrants for PMP records

obtained by Det. Eifling in this case.

Additionally, in assessing whether the good faith exception applies, the court can consider other information known to Det. Eifling at the time he obtained and executed the search warrant.  Det. Eifling knew Jones and was aware of Jones' close relationship to Norris.  Det. Eifling knew that Norris confided in Jones about his (Norris') drug addiction, had given Jones one of the prescription bottles Norris obtained, and that David Scroggins was using Norris to obtain fraudulent prescriptions from Dr. Johns.  Det. Eifling was aware that David Scroggins, Donna Scroggins and Marissa Scroggins all lived together in the house where Norris died, and that David Scroggins declined to cooperate by not allowing law enforcement to look through the remainder of the residence following Norris' death.  Det. Eifling saw Facebook posts between Nick Tyner and Marissa Scroggins following Norris' death about David Scroggins' access to a doctor who would write pill prescriptions.  The background knowledge of Det. Eifling can be considered by the court in determining whether Det. Eifling believed the warrant to be valid and therefore executed in good faith.

Therefore, even if the Court finds that the affidavit for the search warrant of December 1, 2014 lacked probable cause, the search warrant was executed in good faith by Det. Eifling, and the PMP records received and any evidence derived from the records should not be suppressed.

E.  Constitutionality of the Arkansas PMP Act

The defendant challenges the Arkansas PMP Act as unconstitutional and asserts that all evidence obtained by provisions of the Act should be suppressed.   As it relates to suppression of evidence, this court need not decide the constitutionality of the Arkansas PMP Act.  "The exclusionary rule does not apply where officers act in reasonable reliance upon a statute, because justice is not served by punishing officers for the mistakes of the legislature." *United States v.*

*Phillips*, 458 Fed.Appx. 757, 759 (10th Cir. 2012)(unreported)(citing, *Illinois v. Krull*, 480 U.S. 340, 349, 107 S.Ct. 1160 (1987)).  In *Phillips*, the defendant argued that the prescription records obtained from the Oklahoma PMP database should be have been suppressed, because the Oklahoma Anti-Drug Diversion Act was unconstitutional.  *Id*.  The Tenth Circuit ruled that the district court, in reviewing a motion to suppress, may consider whether the good-faith exception applies to a search without passing on the constitutionality of the authorizing statute.  *Id*.  The court found that the officers, when obtaining and executing the PMP search warrant, had no reason to believe that the statute was unconstitutional.  *Id*.  This holding is supported by the Supreme Court's rulings in *Leon* and *Illinois v. Krull*.  As explained in *Krull*,

> The approach used in *Leon* is equally applicable to the present case. The application of the exclusionary rule to suppress evidence obtained by an officer acting in objectively reasonable reliance on a statute would have as little deterrent effect on the officer's actions as would the exclusion of evidence when an officer acts in objectively reasonable reliance on a warrant. Unless a statute is clearly unconstitutional, an officer cannot be expected to question the judgment of the legislature that passed the law. If the statute is subsequently declared unconstitutional, excluding evidence obtained pursuant to it prior to such a judicial declaration will not deter future Fourth Amendment violations by an officer who has simply fulfilled his responsibility to enforce the statute as written. To paraphrase the Court's comment in *Leon:* "Penalizing the officer for the [legislature's] error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations."

> *Illinois v. Krull*, 480 U.S. 340, 349, 107 S.Ct. 1160 (1987)).

Det. Eifling had no reason to believe that there was any constitutional issue with the Arkansas PMP Act at the time he sought and executed the search warrants under A.C.A. Section 20-7-606(b)(2)(A).  Therefore, this court need not decide whether the defendant's constitutional arguments have merit in order to decide the suppression issues raised here.  If the Arkansas PMP Act is found to be unconstitutional, that finding has no bearing on the issuance of the search warrants in this case.

F.   Fruit of The Poisonous Tree

The exclusionary rule prohibits introduction of evidence seized during an unlawful search.  *See, Murray v. United States*, 487 U.S. 533, 536, 108 S.Ct. 2529 (1988).  The "fruit of the poisonous tree" doctrine bars the admissibility of evidence directly derived from evidence obtained as a result of an unconstitutional search and seizure.  *See, Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963).  However, in order to exclude evidence under the fruit of the poisonous tree doctrine, the defendant must show more than "the mere fact that a constitutional violation was a 'but-for' cause of the [police's] obtaining [the] evidence."  *Hudson v. Michigan*, 547 U.S. 586, 592, 126 S.Ct. 2159 (2006); *see, United States v. Paralez*, 526 F.3d 1115, 1121 (8th Cir. 2008).  "[B]ut-for causality is only a necessary, not a sufficient, condition for suppression."  *Hudson*, 547 U.S. at 592.   In order to exclude evidence under the fruit of the poisonous tree doctrine, the defendant bears the initial burden of showing a nexus between the illegality and the challenged evidence.  *See, Alderman v. United States*, 394 U.S. 165, 183, 89 S.Ct. 961 (1969)(holding that the defendant must come forward with specific evidence demonstrating that evidence is tainted to be entitled to suppression under the fruit of the poisonous tree doctrine); *United States v. Marasco*, 487 F.3d 543, 547 (8th Cir. 2007)(explaining that the defendant bears the initial burden of establishing the factual nexus between the constitutional violation and the challenged evidence).  If the defendant shows the nexus between the illegality and the challenged evidence, then the government has the burden to show that the connection between the evidence and the illegality is so attenuated as to dissipate the taint.  *See, United States v. Swope*, 542 F.3d 609, 613 (8th Cir. 2008).  The purpose of the exclusionary rule is to deter unlawful police conduct while balancing the public interest in having juries receive all probative evidence of a crime.  *See, Murray*, 487 U.S. at 537 (citing *Nix v. Williams*, 467 U.S.

431, 443, 104 S.Ct.2501 (1984)).  This is achieved by placing law enforcement in the same, not a

worse, position than they would have been had no police error occurred.  *Id.*  "When the

challenged evidence has an independent source, exclusion of such evidence would put the police

in a worse position than they would have been in absent any error or violation."  *Id.* (quoting, *Nix*

*v. Williams*, 467 U.S. 431, 443, 104 S.Ct.2501 (1984)).

The defendant asserts that the following evidence should be suppressed as fruit of the

poisonous tree:

1)  Any written and oral statements made by any person identified through examination of PMP data, including, but not limited to, those individuals identified as CI 1 and CI;

2)  Testimony of any witness identified as a result of examining PMP data in this case;

3)  Testimony of law enforcement officers or others concerning any information discovered in PMP data, or discovered as a result of information or witnesses found or identified in the PMP data;

4)  Tangible evidence later seized in the investigation through execution of warrants based in whole or in part on information resulting or derived from the review of PMP data; or

5)  Electronic recordings of any kind obtained through the cooperation of any witness identified through the use of PMP data.

Essentially, the defendant seeks to exclude all of the evidence in the case if it can possibly be

linked to PMP data.  The defendant has failed to come forward with specific evidence

demonstrating how the evidentiary items listed above are tainted or should be suppressed under

the fruit of the poisonous tree doctrine.  The defendant specifically asserts that evidence from the

individual contacted from the initial PMP warrant (hereafter the PMP individual) and from

David Scroggins is tainted, and that any evidence derived from the PMP individual and David

Scroggins must be suppressed.  However, the PMP individual was not contacted by law

enforcement for the purpose of being a confidential informant against Dr. Johns or David

Scroggins.  The PMP individual reached out to law enforcement and came forward with

information regarding the fraudulent prescription ring without being advised of any part of the

investigation by law enforcement.  Therefore, the PMP individual's information is sufficiently

attenuated from any taint.  Similarly, the investigation into David Scroggins was ongoing at the

time that the PMP individual came forward, and David Scroggins became a confidential

informant against Dr. Johns based on independent law enforcement investigation, not as the

result of any contact law enforcement had with the PMP individual.  Therefore, there is no

connection between the PMP data from the December 1, 2014 warrant and the participation of

David Scroggins in the investigation.  Any evidence obtained by David Scroggins was

discovered through an independent source and not tainted as fruit of the poisonous tree.   The

United States is unable to adequately respond to the general categories of evidence asserted by

the defense as tainted without specific information from the defense on how they are connected

to a constitutional violation resulting from the receipt of PMP data.  Therefore, the defendant has

failed to meet his burden of going forward on the fruit of the poisonous tree doctrine, and such

claims should be denied.


**CONCLUSION**

The affidavit for search warrant dated December 1, 2014 was issued on probable cause to

believe that a crime had been committed under A.C.A. Section 5-64-403 – Controlled Substances

Fraudulent Practices.  The statements of Marissa Scroggins and Eric Jones were consistent with

respect to providing probable cause that Curtis Norris had illegally obtained and used 30 mg

oxycodone from a prescription written by Dr. Richard Johns.  Eric Jones' statement implicating

David Scroggins, as well as Norris, in a scheme to obtain fraudulent prescriptions was corroborated by independent evidence obtained by the affiant from cellular telephones used by the deceased Norris, as well as Marissa Scroggins.  Under A.C.A. § 20-7-606(b)(2)(A), when a certified law enforcement officer has provided probable cause to believe that a crime has occurred, information from the PMP database can be obtained where the officer shows that specified information contained in the database *would assist in the investigation of the crime*. The records requested from the PMP database were limited in scope and relevant to the investigation of the enumerated crime.

The request for all prescription records of Dr. Johns from January 1, 2014 through December 1, 2014, was not overbroad and did not violate the Fourth Amendment interest of Dr. Johns or any of Dr. Johns' patients.  In two recent cases distinguishing and declining to follow *Oregon Prescription Drug Monitoring Program v. U.S. Drug Enforcement Administration*, courts have found that there is a diminished expectation of privacy in prescription records, because controlled substances are highly regulated.  These courts have also found that patients' and practitioners' Fourth Amendment interests must be balanced with the government's interest in preventing diversion of controlled substances and protecting the public against incompetent, impaired, or negligent physicians.  *See, Lewis v. Superior Court of Los Angeles County*, 226 Cal.App.4[th] 933 (2014) and *United States v. Zadeh*, 2014 WL 11370114 (slip copy Dec. 3, 2014).  Because Dr. Johns' prescription records were obtained in compliance with A.C.A. § 20-7-606(b)(2)(A) through a properly executed search warrant issued by a judge, no Fourth Amendment violations have occurred requiring the suppression of evidence from the December 1, 2014 or any of the three subsequent PMP search warrants.

Even if the Court finds that the challenged affidavit lacks probable cause or was

24

overbroad, the good faith exception under *Leon* applies.  The defendant asserts that the good faith exception should not apply, because Det. Eifling was acting recklessly in including "scanty" hearsay in the affidavit, and the judge acted as a "rubber stamp" because the hearsay statements were uncorroborated.  However, the affidavit was not based solely on uncorroborated hearsay of Jones, as discussed above.  Further, the Court can consider information known by Det. Eifling at the time he sought the search warrant in determining whether the officer relied in good faith on the validity of the warrant.  The application of the good faith exception in *Leon* also applies to the defendant's constitutional challenge to the Arkansas PMP Act, because the Court in reviewing a motion to suppress, may consider whether the good-faith exception applies to a search without passing on the constitutionality of the authorizing statute.  Det. Eifling, when obtaining and executing the PMP search warrant, had no reason to believe that the statute was unconstitutional, and suppression of evidence due to a Constitutional challenge is not an appropriate remedy.  *See, Illinois v. Krull*, 480 U.S. 340, 349, 107 S.Ct. 1160 (1987)).

Finally, to exclude the evidence as requested by the defendant under the fruit of the poisonous tree doctrine, the defendant is required to show the nexus between the illegality and the challenged evidence, and then the government has the burden to show that the connection between the evidence and the illegality is so attenuated as to dissipate the taint.  Where evidence has been obtained through an independent source, it cannot be excluded as fruit of the poisonous tree.  The defendant has failed to come forward with specific evidence demonstrating how the evidentiary items listed in his Motion to Suppress are tainted and entitled to be suppressed under the fruit of the poisonous tree doctrine.  The PMP individual who gave information relating to Dr. Johns and David Scroggins came forward to law enforcement after being contacted about a stolen vehicle case and asked if he or she knew Dr. Johns, not as a result of being questioned

about his or her PMP record or being told of any investigation.  At the time the December 1, 2014 PMP search warrant was obtained, David Scroggins was already under investigation by the Lonoke County Sheriff's Office.  No information derived Dr. Johns' PMP record was used to develop David Scroggins as a confidential informant.  Therefore, the evidence obtained by the PMP individual and David Scroggins should not be suppressed as fruit of the poisonous tree.

WHEREFORE, the United States respectfully requests that the defendant's Motion to Suppress be denied.

Respectfully submitted,

CHRISTOPHER R. THYER
United States Attorney

/s/ Anne E. Gardner

By: ANNE E. GARDNER
Assistant U.S. Attorney
Bar No 41461
P.O. Box 1229
Little Rock, AR 72203
501-340-2600
Anne.Gardner2@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Motion was served upon counsel for the defendants pursuant to electronic filing requirements on this 16th day of September, 2016.

/s/ Anne E. Gardner

_____

ANNE E. GARDNER

26